# Exhibit A

ELECTRONICALLY FILED
Superior Court of California
County of Santa Cruz
6/18/2026 2:40 PM
Clerk of the Court by Deputy,
Sandy Garcia

**GRANT & EISENHOFER P.A.**
JENNIFER SARNELLI (#242510)
485 Lexington Ave., 29th Floor
New York, NY 10017
Telephone: (646) 722-8504
Facsimile: (646) 722-8501
Email: jsarnelli@gelaw.com

Counsel for Plaintiff
(Additional Counsel listed on Signature Page)

**SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF SANTA CRUZ**

| | |
|---|---|
| CHRISTINA WASHINGTON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DRISCOLL'S, INC.,<br><br>Defendant. | CASE NO.   26CV02011<br><br>**CLASS ACTION COMPLAINT**<br><br>1. Violation of the Unfair Competition Law (Bus. & Prof. Code § 17200 *et seq.*)<br><br>2. Violation of the False Advertising Law (Bus. & Prof. Code § 17500 *et seq.*)<br><br>3. Violation of the False Advertising Law with Respect to Environmental Representations (Bus. & Prof. Code § 17580 *et seq.*)<br><br>4. Violation of the Consumer Legal Remedies Act (Civ. Code § 1750 *et seq.*)<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Christina Washington ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following against Defendant Driscoll's, Inc. ("Driscoll's" or "Defendant"), upon personal knowledge as to Plaintiff's own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by counsel. Plaintiff seeks both injunctive and monetary relief on behalf of the proposed Class (as defined herein), including an order requiring Driscoll's to disclose the presence of Per-and

Polyfluoroalkyl substances ("PFAS") in its strawberry products ("Strawberries"),[1] as well as the material health and environmental risks associated with PFAS exposure, and restoring to Class members the monies they paid as a result of Defendant's unlawful conduct.  Plaintiff brings claims for Defendant's violation of the Unfair Competition Law (Bus. & Prof. Code § 17200 *et seq.*) (the "UCL"); the False Advertising Law (Bus. & Prof. Code § 17500 *et seq.*) (the "FAL"), including violations of the Environmental Marketing Claims Act (Bus. & Prof. Code § 17580 *et seq.*); and the Consumer Legal Remedies Act (Civ. Code § 1750 *et seq.*) (the "CLRA").

## I.     NATURE OF THE ACTION

1.     This consumer protection class action arises from Driscoll's marketing, labeling, and sale of Strawberries that it represents to consumers as being produced "subject to rigorous food safety and quality standards" while failing to disclose the presence, risk of, and/or use of persistent fluorinated pesticide compounds associated with so-called "forever chemicals" and PFAS-related compounds. At the same time, Driscoll's ran an environmentally friendly campaign—greenwashing its true farming and manufacturing practices that included these forever chemicals known to be extraordinarily difficult to clean up and break down and accumulate in the environment and living organisms, including humans.

2.     Driscoll's does not market its Strawberries as a mere agricultural commodity. For decades, Driscoll's has invested tens of millions of dollars cultivating a brand synonymous with exceptional quality, safety, scientific innovation, and consumer trust. As the world's largest berry company, Driscoll's identifies food safety as its "single most important focus" and promotes extensive oversight measures, including pesticide controls, testing protocols, third-party audits, water monitoring, and quality assurance programs designed to ensure consumers receive the "freshest, safest, [and] most flavorful" berries.[2]

---

[1] This action concerns Defendant's conventional strawberry products ("Strawberries") and does not challenge Defendant's separately marketed organic strawberry products.

[2] Driscoll's, *Food Standards for Berries*, https://www.driscolls.com/about/Our-Practices/Food-Safety (last visited June 9, 2026).

CLASS ACTION COMPLAINT

3.      Consistent with that brand identity, Driscoll's prominently markets its products as "Only the Finest Berries," a trademarked slogan displayed on its iconic bright-yellow packaging and throughout its advertising.[3]



4.      Through these and numerous other representations and misleading partial disclosures described below, Driscoll's conveys to Plaintiff and other reasonable consumers that its Strawberries are produced pursuant to food-safety and quality standards exceeding those associated with ordinary produce. These representations and are central to Driscoll's branding and consumer appeal because modern consumers increasingly pay premium prices for foods (especially fruit and berries) that they believe are safer, cleaner, and subject to heightened quality controls. As shown by a survey published by Pew Research, 93% of consumers are concerned about the presence of harmful chemicals, such as PFAS, in their food.[4]

---

[3]      Driscoll's, *Strawberry Sweetness Worth Sharing*, https://www.driscolls.com/Berries/Strawberries (last visited June 9, 2026).

[4] Jennifer McPartland, *Americans are concerned about harmful chemicals in food, water and everyday products*, PEW RSCH. (Feb. 26, 2026), https://www.pew.org/en/research-and-analysis/articles/2026/02/26/americans-are-concerned-about-harmful-chemicals-in-food-water-and-everyday-products (93% of respondents indicated they were very, somewhat, or a little concerned about themselves or their loved ones being exposed to harmful chemicals in their food).

CLASS ACTION COMPLAINT



Figure 1

**Most U.S. Adults Are Concerned About Harmful Chemicals in the Environment, Consumer Products**

Survey responses by exposure source

Notes: Respondents were asked, "Some chemicals may harm health. How concerned are you, if at all, about you or your loved ones being exposed to these chemicals in each of the following?" The margin of error for the survey is plus or minus 1.39 percentage points at the 95% confidence level.

© 2026 The Pew Charitable Trusts | View image

5.      Further, the same survey shows that 83% of consumers want companies to tell them more about what chemicals are in their products so that they can make informed choices.[5]



Notes: Respondents were instructed, "The following questions ask you to choose between two statements. Please choose the statement that best describes what you think, even if neither describes you perfectly." The margin of error for the survey is plus or minus 1.39 percentage points at the 95% confidence level.

© 2026 The Pew Charitable Trusts | View image

---

[5] *Id*. (83% of respondents chose the statement, "I want companies to tell me more about what chemicals are in their products so that I can make informed choices," as best describing what they think).

CLASS ACTION COMPLAINT

6.      Driscoll's also highlights its focus on sustainability and ensuring water conservation and quality in its farming practices, representing to consumers that "[w]e see economic performance as inseparable from social and environmental performance. This concept is commonly referred to as the Triple Bottom Line," despite knowing it uses harmful PFAS in its farming practices.

7.      Driscoll's focus on sustainability is unsurprising, because it knows that reasonable consumers care about sustainability and will pay a premium for sustainably produced products. In 2024, PricewaterhouseCoopers published a survey that found that consumers would spend 9.7% more, on average, for sustainably produced or sourced goods, despite inflation and cost-of-living concerns.[6] Likewise, another market watch group concluded that "American consumers have spoken. They want to work with sustainable businesses, and they're willing to pay more for sustainable products and services."[7]



---

[6] PricewaterhouseCoopers, *Consumers willing to pay 9.7% sustainability premium, even as cost-of-living and inflationary concerns weigh: PwC 2024 Voice of the Consumer Survey* (May 15, 2024), *at* https://www.pwc.com/gx/en/news-room/press-releases/2024/pwc-2024-voice-of-consumer-survey.html.

[7] PDI Technologies, *Report Shows Consumers Want Sustainable Products* (Apr. 26, 2023), https://pditechnologies.com/resources/report/2023-business-sustainability-index/?utm_source=prnewswire&utm_medium=press-release&utm_campaign=bosi-2023.

CLASS ACTION COMPLAINT

8.      Similarly, a survey conducted by NIQ found that 77% of respondents would stop purchasing from a brand if it was found guilty of greenwashing.[8]



9.      In the end, and contrary to its representations and misrepresentations, independent testing detected PFAS compounds in Driscoll's Strawberries. PFAS, often referred to as "forever chemicals," have become the subject of increasing scientific and consumer scrutiny due to their resistance to degradation, tendency to bioaccumulate, and adverse health effects associated with exposure.

10.     Reasonable consumers do not expect that premium Strawberries that Driscoll marketed through extensive representations concerning safety, quality control, purity, and rigorous oversight would contain PFAS residues or PFAS-related compounds. Nor do they expect that products promoted as meeting exceptional food-safety standards would expose them to compounds associated with the growing global concern surrounding "forever chemicals."

---

[8] NIQ, *How to turn green consumer intentions into sustainable actions* (Sept. 26, 2023), https://nielseniq.com/global/en/insights/report/2023/how-to-turn-green-consumer-intentions-into-sustainable-actions/.

CLASS ACTION COMPLAINT

11. Had Plaintiff and consumers known the true facts concerning the Strawberries, including the presence and/or use of PFAS-related compounds, they would not have purchased the products or would have paid significantly less for them.

12. Driscoll's knew, or at minimum should have known, that information concerning PFAS-related compounds in its Strawberries was material to reasonable consumers. Driscoll's likewise knew that PFAS have become the subject of extensive public scientific, and regulatory scrutiny concerning their potential effects on human health and the environment.

13. Despite possessing superior knowledge regarding its farming practices and the use of pesticides containing PFAS, Driscoll's does not disclose the presence, use, or risk of PFAS-related compounds on its Strawberry packaging, labeling, or point-of-sale marketing. Instead, it affirmatively promotes its Strawberries as "Only the Finest Berries" and emphasizes its rigorous food-safety and quality standards.

14. This action concerns Driscoll's misleading partial disclosures and failure to disclose material information that directly contradicts the premium safety, quality, and purity message it chose to convey to consumers. Having elected to market its Strawberries as subject to exceptional food-safety and quality controls, Driscoll's had a duty to disclose facts that would materially alter how a reasonable consumer understood those representations.

## II. THE PARTIES

15. Plaintiff Christina Washington is, and at all relevant times has been, a resident of California.

16. Plaintiff purchased Driscoll's Strawberries throughout the Class Period from her local grocery store and through online, same-day delivery services. In making those purchases, Plaintiff reviewed and relied upon Driscoll's packaging, labeling, marketing, and other representations emphasizing the quality, safety, rigorous standards, and trustworthiness associated with Defendant's Strawberries and brand. Through these representations, Defendant conveyed that the Strawberries were suitable for consumption and met reasonable consumer expectations regarding safety and quality. Consistent with those representations and partial disclosures, Plaintiff believed that Driscoll's Strawberries were free from undisclosed

contaminants and substances that reasonable consumers seek to avoid. Plaintiff did not expect that the Strawberries would contain or be produced using PFAS-related compounds or persistent fluorinated pesticides. Had Driscoll's disclosed these facts, Plaintiff would not have purchased the Strawberries or would have paid less for them. She would purchase the Strawberries again if they were free from PFAS contamination.

17.     Defendant Driscoll's, Inc., formerly known as Driscoll Strawberry Associates, Inc., is a California corporation with its principal place of business in Watsonville, California. Defendant, a berry juggernaut, regularly conducts business throughout California and in this judicial district.

## III.    JURISDICTION AND VENUE

18.     This case is brought as a class action to remedy violations of California law by Defendant. This Court has jurisdiction over Defendant because it is incorporated in California, it does sufficient business in California, has sufficient minimum contacts in California, or otherwise intentionally avails itself of the California market through its marketing, distribution, and sales of the Strawberries in California, including to Plaintiff.

19.     This Court also has personal jurisdiction over Defendant as it conducts a substantial part of its operations with regular and continuous business activity in California, through its packaging, marketing, and retail of the Strawberries.

20.     Venue is proper in this Court pursuant to Section 395(a) of the Code of Civil Procedure, because Defendant conducts business in Santa Cruz County, the acts giving rise to the violations complained of occurred in Santa Cruz County. Venue is also proper pursuant to Civil Code section 1780(d).

## IV.    FACTUAL ALLEGATIONS

### A.    THE HISTORY OF DRISCOLL'S STRAWBERRIES

21.     Driscoll's is a California-based seller and marketer of fresh Strawberries and other berries. Founded in the late nineteenth century, the company is the world's largest berry

8

producer, now controlling at least one-third of the $9 billion U.S. berry market. Strawberries are Driscoll's most popular berry.

22. Driscoll's operates a vertically coordinated berry business built around proprietary plant genetics, exclusive licensing arrangements, and a network of approved growers. Rather than cultivating all berries itself, Driscoll's develops and owns patented and proprietary berry varietals, which it licenses exclusively to growers that satisfy Driscoll's standards and contractual requirements. Through this model, Driscoll's exercises substantial control over berry production, cultivation practices, quality standards, harvesting protocols, packaging, branding, and distribution, even where independent growers perform the physical farming operations.

23. Driscoll's began in California in the late 1800s when Ed Reiter and his brother-in-law, Dick Driscoll, started growing Strawberries near Watsonville during California's early strawberry boom. Around 1902, they planted and commercialized a distinctive berry known as the "Banner" strawberry. Driscoll's was officially founded in 1904 as Banner Berry Farm's Brand and sold the Banner strawberry variety exclusively.

24. During World War II, much of the strawberry industry struggled after Japanese-American farmers were forced into internment camps, but Driscoll's continued operating. After the war, the company worked with Japanese-American farmers returning to agriculture. Around this time, the company began operating under the name Driscoll Strawberry Associates, Inc.

25. In the decades that followed, Driscoll Strawberry Associates expanded its berry breeding, licensing, and distribution operations and eventually became one of the largest berry companies in the world. Today, Driscoll's markets strawberries, blueberries, raspberries, and blackberries throughout the United States and internationally through a network of licensed growers. Driscoll's represents that it exercises extensive oversight of these growers, including through audits, monitoring, and compliance programs designed to ensure adherence to its growing standards, including standards governing pest-control methods and pesticide use for berries sold under the Driscoll's brand.

26. The company also touts that it pioneered innovations in packaging and consumer marketing, including widespread use of the plastic berry "clamshell" container now ubiquitous

in grocery stores. By continuously introducing new berry varieties optimized for flavor, appearance, shelf life, and transportability, Driscoll's became the dominant branded berry supplier in the United States and ultimately the world's largest berry company.

27. Today, Driscoll's markets berries grown in more than twenty countries and sold across dozens of international markets. Although the company publicly describes itself as working with independent growers, it retains substantial control over the underlying genetics, licensing, quality standards, branding, packaging, and commercialization of its berries. The company's modern business model is built around proprietary breeding programs, extensive research and development operations, and tight control over the berry varieties authorized for production under the Driscoll's name.

28. Defendant markets and sells both conventional and USDA-certified organic strawberries through distinct product lines. Organic strawberries are subject to separate federal organic certification requirements and restrictions governing pesticide usage.

29. The testing and reporting underlying this action identified pesticide residues and PFAS-related fluorinated compounds in Driscoll's conventional Strawberries.

30. By contrast, publicly reported testing concerning Defendant's organic strawberries showed either non-detect results or materially different residue profiles.

31. The distinction between Defendant's conventional and organic strawberries further demonstrates that Defendant was capable of marketing and selling Strawberries cultivated under materially different pesticide-use standards while allegedly failing to adequately disclose the nature of the pesticide compounds associated with its conventional Strawberries.

32. Reasonable consumers purchasing Defendant's conventional Strawberries would expect Strawberries marketed as "safe," "wholesome," and produced under "rigorous food safety standards" not to contain persistent fluorinated pesticide compounds and PFAS-related residues that consumer increasingly seek to avoid.

**B. DRISCOLL'S MARKETS ITS STRAWBERRIES AS CAREFULLY CONTROLLED, SAFE, PREMIUM STRAWBERRIES PRODUCED UNDER RIGOROUS AGRICULTURAL AND FOOD SAFETY STANDARDS**

10

CLASS ACTION COMPLAINT

33.    Driscoll's does not market its Strawberries as an undifferentiated commodity produce product. Instead, Driscoll's has carefully cultivated a premium brand identity centered on representations of safety, quality, wholesomeness, sustainability, and rigorous agricultural oversight.

34.    Through its packaging, website, advertising, and grower standards, Driscoll's repeatedly assures consumers that its Strawberries are grown using carefully controlled practices designed to minimize harmful inputs and promote consumer health and safety.

35.    Indeed, Driscoll's prominently advertises that it sells, "Only The Finest Berries," a phrase it has trademarked and displayed on bright yellow product packaging.



CLASS ACTION COMPLAINT

36.     Driscoll's further defines the "Driscoll's Difference" by representing that its berries are "hand-picked at peak ripeness to meet our strict quality standards," while assuring consumers that its Strawberries are "naturally grown" and "never genetically modified."[9]



37.     Driscoll's emphasizes to consumers that it exercises extensive oversight and scientific control over the berry growing process. On its "How We Grow" and related webpages, Driscoll's represents that "patented berry varieties are primarily developed through years of research using only natural breeding methods."[10]



---

[9]     Driscoll's, *Strawberry Sweetness Worth Sharing*, https://www.driscolls.com/Berries/Strawberries (last visited June 9, 2026).

[10] Driscoll's, *Our Practices*, https://www.driscolls.com/about/Our-Practices (last visited June 9, 2026).

CLASS ACTION COMPLAINT

38.    Driscoll's similarly represents that its experts "use natural breeding methods" and that it "[n]ever irradiate[s] or genetically modif[ies]" its plants.[11]

*Growing only the finest berries in the world begins with Driscoll's commitment to research and development.*

Our experts use natural breeding methods to create our patented varieties. Of course, the first thing we look for is flavor.

We rely on natural cross-pollination techniques to continually improve Driscoll's berries. We never irradiate or genetically modify our plants.

We naturally breed berry plants to be more resistant to diseases and pests while meeting our quality standards for flavor and appearance. Each year, we study thousands of potential plants to choose the top 1% to farm and sell under the Driscoll's brand name. It takes five to seven years to produce a seedling that is ready for commercial production. Every season, we flavor-test more than 500 selected varieties from our test plots around the world. Every Driscoll's berry must be flavorful, attractive, resistant to disease and hardy enough to ship well and arrive fresh at the store.

Driscoll's patented plants are available only to our independent farmers.

39.    The company further represents that its nursery locations are "carefully selected" to keep soil "free of pests and diseases" and that berry cuttings are grown in "the germ-free environment of Driscoll's screen houses."



Every Driscoll's berry begins life at the nursery. Driscoll's nursery locations are carefully selected based on their geographic isolation, which keeps the soil free of pests and diseases.Cuttings are taken from an original selected seedling and grown in the germ-free environment of Driscoll's screen houses. From there, the seedlings are planted and grown in nursery fields, a process that can take several years. After the seedlings are harvested, they are carefully packed and shipped to our coolers, where they are kept chilled so that the plants remain in hibernation. Our independent farmers pick up their seedlings just in time for planting.

---

[11] Driscoll's, *How We Grow Our Berries*, https://www.driscolls.com/about/our-practices/how-we-grow (last visited June 9, 2026).

13

40. Driscoll's actively markets its Strawberries as uniquely superior products that stand apart from all other berries available to consumers. As Driscoll's current Chief Executive Officer Soren Bjorn has exclaimed, "[y]ou have to find a way to say this strawberry is different from that strawberry, which isn't necessarily an easy thing to do. But our strawberries actually are different — no one else grows the strawberries we grow."[12] Driscoll's marketing efforts reinforce this message, with the company emphasizing that it is "aiming to get Americans to understand what makes Driscoll's berries unique."[13]

41. Furthermore, as reported in THE NEW YORKER, Driscoll's internally positions its berries as "the produce category most associated with happiness," mapping consumer associations with its Strawberries to concepts such as "Freedom and Harmony."[14] Driscoll's president has stated that the company has "helped shape what a strawberry looks like with our relentless focus," signaling that Driscoll's exercises comprehensive control over the breeding, production, and quality of its fruit. [15]

42. Likewise, Driscoll's brand strategist Frances Dillard has explained that "[c]onsumers have to be more satisfied, or what we call more delighted, all the time," underscoring the company's commitment to delivering berries that meet heightened consumer expectations for quality, safety, and consistency.[16]

43. Driscoll's also markets its Strawberries as cultivated using environmentally responsible and sustainability focused practices designed to minimize unnecessary chemical inputs. For example, Driscoll's represents, "[b]erries aren't produced in a factory; they're grown outside in a dynamic biological environment. The farmers' challenge is to work with nature, using years of experience and know-how to get the very best out of each berry plant. The goal

---

[12] Stephanie Strom, *Driscoll's Aims to Hook the Berry-Buying Shopper*, INT'L N.Y. TIMES, Sept. 9, 2016, *available at* https://www.nytimes.com/2016/09/09/business/driscolls-aims-to-hook-the-berry-buying-shopper.html.

[13] *Id.*

[14] Dana Goodyear, *How Driscoll's Reinvented the Strawberry*, NEW YORKER (Aug. 14, 2017), *available at* https://www.newyorker.com/magazine/2017/08/21/how-driscolls-reinvented-the-strawberry.

[15] *Id.*

[16] *Id.*

CLASS ACTION COMPLAINT

of every Driscoll's farmer is to shape, rather than control, the biological diversity of their fields, with a minimum amount of agricultural inputs."[17]



*Berries aren't produced in a factory; they're grown outside in a dynamic biological environment. The farmers' challenge is to work with nature, using years of experience and know-how to get the very best out of each berry plant. The goal of every Driscoll's farmer is to shape, rather than control, the biological diversity of their fields, with a minimum amount of agricultural inputs.*

44.     Driscoll's also accentuates to consumers that all of its berries are non-GMO and that its "Research and Development Department is the industry leader in the development of premium berry plants that utilize natural and traditional breeding processes."[18]

---

[17] Driscoll's, *How We Grow*, https://www.driscolls.com/about/our-practices/how-we-grow (last visited June 9, 2026).

[18] Driscoll's, *Strawberry Sweetness Worth Sharing*, https://www.driscolls.com/Berries/Strawberries (last visited June 9, 2026).

CLASS ACTION COMPLAINT



Nothing says summer like biting into an amazingly sweet and fresh strawberry. Driscoll's strawberries can transport you to sunny days of picnics, parties and family gatherings. They're the perfect addition to a smoothie, topping on a fresh strawberry short cake, or snack right from the bowl. For more than 100 years, our berries have been a delicious treat any time of the day…and any month of the year.

**Discover Strawberries**

∨ WHY DO STRAWBERRIES MOLD SO FAST?

∨ WHERE DO DRISCOLL'S STRAWBERRIES COME FROM?

∧ ARE STRAWBERRIES GMO?

All Driscoll's berries, both conventional and organic, are non-GMO. Driscoll's Research and Development department is the industry leader in the development of premium berry plants that utilize only proven natural and traditional breeding processes.

45.     In its environmental stewardship statement, Driscoll's further represents that, "[w]e support innovations and sustainable practices that protect the long-term viability of agriculture and the berries we all love," while also explaining that its art of growing berries fosters "ideas and innovations that boost biodiversity, opportunity, and sustainability."[19]

---

[19] Driscoll's, *One Family One Earth*, https://www.driscolls.com/one-family-one-earth (last visited June 9, 2026).

CLASS ACTION COMPLAINT





46.    Driscoll's specifically represents that it employs Integrated Pest Management ("IPM") principles designed to reduce pesticide use and environmental impacts. According to Driscoll's, "IPM employs a combination of natural and synthetic means to reduce disease and pest pressures," relies upon "constant field monitoring," and includes "the use of beneficial organisms to control damaging pests." Driscoll's additionally represents that it has "made a commitment to significantly increase the production of organic berries and utilize our experience

17

CLASS ACTION COMPLAINT

in organic farming to reduce the use of synthetic materials (including pesticides) in all of our products."[20]

## Pesticides

In the United States, federal and state laws strictly regulate the use of pesticides. U.S. EPA, U.S. FDA, and state and county agencies all have regulatory authority governing the safe use of pesticides. All independent farmers around the world who grow Driscoll's berries must adhere to local and federal laws applicable to that growing region as well as country specific import and export regulations.

Driscoll's independent farmers are leaders in the practice of Integrated Pest Management (IPM). IPM employs a combination of natural and synthetic means to reduce disease and pest pressures. IPM employs constant field monitoring and also includes the use of beneficial organisms to control damaging pests. Driscoll's independent farmers are free to choose which Integrated Pest Management methods they use. Regardless of the pest control method, all pesticide use must be in compliance with federal and state laws.

Driscoll's has made a commitment to significantly increase the production of organic berries and utilize our experience in organic farming to reduce the use of synthetic materials (including pesticides) in all of our products. For additional information on specific pesticides available for use by farmers, please refer to the U.S. EPA's website.

47.     Beyond sustainability messaging, Driscoll's repeatedly assures consumers that its Strawberries are subject to rigorous food safety standards and oversight mechanisms. Driscoll's represents that its berries are "grown, harvested and shipped with the highest standards of care possible" and that its "rigorous food safety standards apply regardless of where the berries are grown." Driscoll's further states that its Global Food Safety Program was developed through "decades of research, consumer feedback and close cooperation with food safety experts as well as state, federal and international regulatory agencies."[21]

---

[20] Driscoll's, *Food Safety Standards for Berries*, https://www.driscolls.com/about/Our-Practices/Food-Safety (last visited June 9, 2026).
[21] *Id.*

# Driscoll's Global Food Safety Program

Our berries are grown, harvested and shipped with the highest standards of care possible and our rigorous food safety standards apply regardless of where the berries are grown. Driscoll's Global Food Safety Program has been developed from decades of research, consumer feedback and close cooperation with food safety experts as well as state, federal and international regulatory agencies. It is founded on the principles of Good Agriculture Practices (GAPs) established by the United States Food and Drug Administration (FDA) and reinforced through education, laboratory assays and annual third party audits.

48.    Driscoll's also represents that it actively audits and monitors compliance throughout its grower network. According to Driscoll's, independent third-party auditors verify that Good Agricultural Practices are followed "on every farm and facility around the world," including monitoring "soil, water, fertilizer use, pest control methods, harvest practices and food safety and security procedures." Driscoll's further represents that "[n]on-compliance issues are addressed and corrective measures are verified by Driscoll's," and that growers face "consequences, up to and including termination of their association with Driscoll's" for violations of company policy.[22]

49.    Driscoll's similarly markets itself as committed to providing consumers with the "freshest, safest, and most flavorful berries," while emphasizing that consumer safety and product "wholesomeness" are central priorities. Driscoll's also touts the role of its "Berry Innovators," including "agronomists, breeders, sensory analysts, plant health scientists, and entomologists," who supposedly work "with Mother Nature to develop the best berries possible using proven natural traditional breeding practices."[23]

---

[22] *Id.*

[23] Driscoll's, *Finest Berries Start Here*, https://www.driscolls.com/about/berry-innovators (last visited June 9, 2026).

CLASS ACTION COMPLAINT



Home / About / Berry Innovators

## Driscoll's Berry Innovators

Share

Strawberries that are firm, but not too crunchy. Raspberries that are sweet and juicy, but not mushy. Blackberries that are huge, beautiful, and burst in your mouth with juicy flavor. And blueberries that are flavorful, but not tart. These near perfect berries don't happen by accident. Growing perfectly fresh, beautiful, delicious berries is as much of an art as it is a science. The Berry Innovators are the artists behind those berries.

Working together as a team of agronomists, breeders, sensory analysts, plant health scientists, and entomologists, the Berry Innovators research and develop the very highest quality berries. The Berry Innovators work with Mother Nature to develop the best berries possible using proven natural traditional breeding processes such as hand cross-pollination (Driscoll's Berries are not genetically modified) and to ensure that those fresh, tasty, colorful berries make their way to berry lovers the world over.

Driscoll's is excited to share some of these techniques it uses to make its patented varieties of berries and tell you about some of the people behind the scenes who are dedicated to ensuring the top quality at every stage of the process.

50.     Driscoll's wants consumers to know the importance of investing in physical health. In fact, Driscoll's "invest[s] in local health and education programs, and safeguard vital spaces that promote the social and physical wellness of everyone."[24]

---

[24] Driscoll's, *One Family, One Earth*, https://www.driscolls.com/one-family-one-earth (last visited June 9, 2026).

CLASS ACTION COMPLAINT



51.     Finally, Driscoll's seeks to differentiate itself by representing that, "[u]nlike other companies, Driscoll's sends its berry varieties to farmers who grow plants that the Berry Innovators determine are of superior quality. That means that every Driscoll's berry comes from a fruit plant that meets Driscoll's high standards."[25]

---

[25]    Driscoll's, *How We Test for the Best*, https://www.driscolls.com/about/berry-innovators/Identifying-The-Best-Berries (last visited June 9, 2026).

CLASS ACTION COMPLAINT



## How We Test for the Best

Share

Unlike other companies, Driscoll's sends its berry varieties to farmers who grow plants that the Berry Innovators determine are of superior quality. That means that every Driscoll's berry comes from a fruit plant that meets Driscoll's high standards.

52.     Taken together, Driscoll's extensive marketing and public statements communicate to reasonable consumers that its Strawberries are cultivated using carefully monitored, environmentally reasonable methods designed to minimize harmful chemical exposure and ensure safe, wholesome produce. As detailed below, reasonable consumers would understand and interpret these representations to mean that Defendant's Strawberries are not associated with persistent fluorinated pesticide compounds or PFAS-related chemicals that consumers increasingly seek to avoid, particularly in fresh produce marketed to families and children.

53.     Driscoll's knew or should have known that reasonable consumers are increasingly concerned about PFAS compounds, persistent pesticide residues and synthetic chemical exposure in Strawberries. Driscoll's representations above and incomplete representations were material because reasonable consumers would have considered the

presence and/or use of PFAS-related pesticide compounds important in deciding whether to purchase Defendant's Strawberries and how much to pay for them.

## C.   CONSUMERS SEEK TO AVOID PFAS-RELATED COMPOUNDS AND PERSISTENT PESTICIDES

54.    PFAS are a large class of synthetic chemicals which are harmful to both humans and the environment.[26] Fluorine is an atomic element present in the molecular structure of PFAS.[27]

55.    PFAS are known as "forever chemicals" because their synthetic molecular structure (bonds of carbon and fluorine) is exceedingly strong, such that PFAS do not biodegrade or otherwise break down easily.[28] This is particularly problematic because PFAS are toxic and carcinogenic, are known to be dangerous, and are known to cause serious health issues to those who ingest or are otherwise exposed to them.

56.    Human exposure to PFAS occurs primarily through ingestion, including contaminated food packaging, and food grown or raised in contaminated environments.[29]

57.    PFAS are known to "bioaccumulate" meaning they build up in the body over time because they are slowly excreted and do not readily break down. Thus, ongoing low-level exposure results in a buildup of PFAS within the body.[30]

---

[26] *See, e.g.*, United States Agency for Toxic Substances &Disease Registry ("ATSDR"), *PFAS and Your Health*, https://www.atsdr.cdc.gov/pfas/about/index.html (last visited June 9, 2026).

[27] Nat'l Inst. of Env'l Health Scis. ("NIEHS"), *Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS)*, https://www.niehs.nih.gov/health/topics/agents/pfc/index.cfm (last visited June 9, 2026) ("PFAS molecules have a chain of linked carbon and fluorine atoms. Because the carbon-fluorine bond is one of the strongest, these chemicals do not degrade easily in the environment.").

[28] *Id.*

[29] Herbert P. Susmann et al., *Dietary Habits Related to Food Packaging and Population Exposure to PFASs*, 127(10) ENV'T HEALTH PERSPECTIVES 107003-1 (Oct. 2019), https://ehp.niehs.nih.gov/doi/epdf/10.1289/EHP4092.

[30] NIEHS, *PFAS*, https://www.niehs.nih.gov/health/topics/agents/pfc (last visited June 9, 2026).

23

CLASS ACTION COMPLAINT

58. PFAS are associated with a wide range of adverse health outcomes.[31]

59. For instance, "PFAS have been shown to have a number of toxicological effects in laboratory studies and have been associated with thyroid disorders, immunotoxic effects, and various cancers in epidemiology studies."[32]

60. The United States Environmental Protection Agency ("EPA") reports that "peer-reviewed scientific studies have shown that exposure to certain levels of PFAS may lead to" decreased fertility and high blood pressure in women, developmental delays for children, increased risk of certain cancers, interference with the body's natural hormones, increased cholesterol, increased risk of obesity, and reduced immune system responsiveness.[33]

61. The following figure from the European Environmental Agency ("EEA") graphically depicts the effects of PFAS on the human body:[34]

---

[31] ATSDR, TOXICOLOGICAL PROFILE FOR PERFLUOROALKYLS (May 2021), https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf; Giovanni Costa et al., *Thirty Years of Medical Surveillance in Perfluorooctanoic Acid Production Workers*, 51(3) J. OCCUPATIONAL & ENV'T MED. 364 (2009), https://pubmed.ncbi.nlm.nih.gov/19225424/; EPA, Request for Comment, Solicitation of Interested Parties for Enforceable Consent Agreement Development, and Notice of Public Meeting on Perfluorinated Acid (PFOA), Fluorinated Telomers, 68 Fed. Reg. 18,626, 18,628 (Apr. 16, 2003); Press Release, EPA, *EPA and 3M Announce Phase Out of PFOS* (May 16, 2000), https://archive.epa.gov/epapages/newsroom_archive/newsreleases/ 33aa946e6cb11f35852568e100 5246b4.html; Nuria Matilla-Santander et al., *Exposure to Perfluoroalkyl Substances and Metabolic Outcomes in Pregnant Women: Evidence from the Spanish INMA Birth Cohorts*, 125(11) ENV'T HEALTH PERSPECTIVES 117004-1 (2017), https://ehp.niehs.nih.gov/doi/epdf/10.1289/EHP1062; Yu Zhu et al., *Associations of Serum Perfluoroalkyl Acid Levels with T-Helper Cell-Specific Cytokines in Children: By Gender and Asthma Status*, 559 SCI. TOTAL ENV'T 166 (2016), https://doi.org/10.1016/j.scitotenv.2016.03.187; Vaughn Barry et al., *Perfluorooctanoic Acid (PFOA) Exposures and Incident Cancers Among Adults Living Near a Chemical Plant*, 121(11-12) ENVT'L HEALTH PERSP. 1313 (2013), https://ehp.niehs.nih.gov/doi/10.1289/ehp.1306615; Ann Vuong et al., *Prenatal Polybrominated Diphenyl Ether and Perfluoroalkyl Substance Exposures and Executive Function in School Age Children,* 147 ENV'T RES. 556 (2016), https://doi.org/10.1016/j.envres.2016.01.008; Stephanie J. Frisbee et al., *Perfluorooctanoic Acid, Perfluorooctanesulfonate, and Serum Lipids in Children and Adolescents: Results from the C8 Health Project*, 164(9) ARCHIVES PEDIATRICS & ADOLESCENT MED. 860 (2010), https://doi.org/10.1001/archpediatrics.2010.163.

[32] *Id.*

[33] EPA, *Our Current Understanding of the Human Health and Environmental Risks of PFAS*, https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas (last visited June 9, 2026).

[34] European Env'l Agency, *Emerging Chemical Risks in Europe—'PFAS'* (Dec. 16, 2019), *available at* https://www.eea.europa.eu/en/analysis/publications/emerging-chemical-risks-in-europe.

24

**Figure 1. Effects of PFAS on human health**



Sources: US National Toxicology Program, (2016); C8 Health Project Reports, (2012); WHO IARC, (2017); Barry et al., (2013); Fenton et al., (2009); and White et al., (2011).

62.     Research conducted by the Harvard T.H. Chan School of Public Health in 2012 establishes that children with higher PFAS exposure had worse responses to standard childhood vaccines and that "when PFA exposure was doubled, children would lose 50% of the antibodies they should have had from their vaccinations."[35] This research also established that "children with higher levels of PFAS when they were born . . . had lower antibody levels in response to later vaccinations."[36]

---

[35] Staff Writer, *Stricter federal guidelines on 'forever chemicals' in drinking water pose challenges*, HARVARD T.H. CHAN SCH. PUB. HEALTH (June 22, 2022), https://hsph.harvard.edu/news/stricter-federal-guidelines-on-forever-chemicals-in-drinking-water-pose-challenges/.

[36] *Id.*

25

63.    Research conducted by the National Cancer Institute's Division of Cancer Epidemiology & Genetics has also shown that PFAS "measured in women during pregnancy were associated with risk of childhood acute lymphoblastic leukemia in their offspring."[37] The research found that "[b]ecause PFOS and PFOA can suppress antibody responses, it is plausible for some PFAS to be risk factors for childhood leukemia."[38]

64.    The EPA has advised, "[b]ecause certain PFAS are known to cause risks to human health, the most important steps you and your family can take to protect your health is to understand how to limit your exposure to PFAS by taking [steps to] reduce possible exposure during daily activities."[39]

65.    Notably, there is currently no medical treatment capable of removing PFAS from the human body. Given that PFAS accumulate in body tissue over time, the most effective means of reducing PFAS exposure is to avoid contact with or ingestion of PFAS.[40]

66.    "No level of PFAS in the body is considered safe, and [PFAS chemicals] have been linked to a litany of health problems, including cancers[,]"[41] including certain "digestive, endocrine, respiratory, and mouth and throat cancers."[42]

---

[37] Jennifer K. Loukissas, *Childhood Leukemia Linked to PFAS Levels Measured in Mother's First Trimester*, NAT'L CANCER INST. (Dec. 13, 2023), https://dceg.cancer.gov/news-events/news/2023/pfas-childhood-leukemia.

[38] *Id.*

[39] EPA, *Meaningful and Achievable Steps You Can Take to Reduce Your Risk*, at https://www.epa.gov/pfas/meaningful-and-achievable-steps-you-can-take-reduce-your-risk (last updated Apr. 21, 2026).

[40] George Citroner, *How to Avoid 'Forever' Chemicals in Your Dinner (and Microwave Popcorn)*, HEALTHLINE (Oct. 10, 2019), https://www.healthline.com/health-news/how-to-avoid-the-forever-chemicals-in-your-dinner-and-popcorn#So-how-can-you-avoid-PFAS.

[41] Jenny Blair, *Forever Chemicals Promote Cancer Cell Migration*, YALE SCH. PUB. HEALTH (Dec. 11, 2023), https://ysph.yale.edu/news-article/yale-study-forever-chemicals-promote-cancer-cell-migration/.

[42] Press Release, Zara Abrams, *Study links PFAS contamination of drinking water to a range of rare cancers* (Jan. 14, 2025), https://keck.usc.edu/news/study-links-pfas-contamination-of-drinking-water-to-a-range-of-rare-cancers/; *see also* Nat'l Cancer Inst., *PFAS Exposure and Risk of Cancer*, https://dceg.cancer.gov/research/what-we-study/pfas (considering some PFAS possible and human carcinogens (last visited June 9, 2026).

CLASS ACTION COMPLAINT

67. Exposure to PFAS has also been scientifically linked to "reproductive harm, immune system damage," and influence on the nervous system and brain development.[43]

68. Exposure to PFAS has been shown to be associated with a wide range of additional adverse health effects or risks of such effects, including:

    a.    Reproductive effects such as decreased fertility or increased high blood pressure in pregnant women;

    b.    Developmental effects or delays in children, including low birth weight, accelerated puberty, bone variations, or behavioral changes;

    c.    Increased risk of some cancers, including prostate, kidney, and testicular cancers;

    d.    Reduced ability of the body's immune system to fight infections, including reduced vaccine response;

    e.    Interference with the body's natural hormones; and

    f.    Increased cholesterol levels and/or risk of obesity.[44]

69. Moreover, a recent study conducted by the Yale School of Public Health revealed that exposure to PFAS increases the ability of colorectal carcinoma cells to move, or spread, throughout the body.[45] The study's researchers observed that "increased cell motility" and "found metabolic changes that were consistent with cancer metastasis."[46]

---

[43] U.N. Environment Programme, *Per- and Polyfluoroalkyl Substances (PFASs)*, https://www.unep.org/topics/chemicals-and-pollution-action/pollution-and-health/persistent-organic-pollutants-pops/and (last updated Feb. 13, 2024).

[44] EPA, *supra* n.33.

[45] Blair, *supra* n.41.

[46] *Id*.

27

CLASS ACTION COMPLAINT

70.     Additionally, PFAS exposure could be linked to thyroid disease and increased cholesterol levels and liver disease.[47] PFAS may delay mammary gland development and lower birth weight in unborn children.[48]

71.     PFAS can also be transmitted from the mother to the child across the placenta before a child has been born as well as through breast milk.[49] This may result in babies with ten times more PFAS in their blood than their mothers.[50]

72.     Children with higher PFAS exposure can have "a poorer response to routine childhood vaccinations[.]"[51] For example, "when PFAS exposure was double, children would lose 50% of the antibodies they should have had from their vaccinations[.]"[52]

**D.     INDEPENDENT TESTING DETECTED PFAS-RELATED PESTICIDE COMPOUNDS**

73.     In or around May 2026, public reporting (the "Mamavation Report") discussed independent laboratory testing identifying multiple pesticide residues on Driscoll's Strawberries, including fluorinated pesticide compounds and/or compounds associated with PFAS chemistry.[53]

74.     In particular, the independent testing found that Driscoll's Strawberries contained residues of 12 different pesticides, eight of which are considered PFAS "forever chemicals," meaning they are extremely persistent and highly toxic. These pesticides are also known as "forever pesticides."

---

[47] Suzanne E. Fenton et al., *Per- and Polyfluoroalkyl Substance Toxicity and Human Health Review: Current State of Knowledge and Strategies for Informing Future Research*, ENV'T TOXICOLOGY & CHEMISTRY 606 (Oct. 5, 2021), https://pmc.ncbi.nlm.nih.gov/articles/PMC7906952/.

[48] *Id*.

[49] Staff Writer, *supra* n.35.

[50] *Id*.

[51] *Id*. ("children with higher levels of PFAS when they were born . . . had lower antibody levels in response to later vaccinations.").

[52] *Id*.

[53] Leah Segedie, *Mamavation Finds PFAS-Laden Pesticides in Driscoll's Strawberries*, MAMAVATION (May 12, 2026), https://mamavation.com/food/pfas-pesticides-driscolls-strawberries.html.

75.    The following is a list of the PFAS-Laden Pesticides (a.k.a "Forever Pesticides") found on Driscoll's Strawberries:

a.    Flonicamid (sum) 32 ppb

b.    Fludioxonil 60 ppb

c.    Flupyradifurone 27 ppb

d.    Fluxapyroxad 26 ppb (limit also exceeds Russian standards)

e.    Indoxacarb 25 ppb (limits also exceed European Union, Taiwan & Chile standards)

f.    Novaluron 19 ppb (limits also exceed European Standards)

g.    Tetraconazole 13 ppb

h.    TFNG 35 ppb

76.    Other types of pesticides found on Driscoll's conventional Strawberries, include:

a.    Cyprodinil 125 ppb

b.    Pyrimethanil 310 ppb

c.    Quinoxyfen 45 ppb (limit also exceeds Korean standards)

d.    Tetrahydrophthalimide (THPI) 302 ppb

77.    The Mamavation Report has generated significant consumer concern in news outlines and on social media regarding the nature of the pesticide residues allegedly present on Driscoll's Strawberries.

78.    On May 18, 2026, Moms Across America, a "national nonprofit coalition of mothers and others dedicated to empowering millions to educate themselves about the health impacts of GMOs, pesticides, and toxins in [the] food supply,"[54] posted on social media that [c]hildren living near Driscoll's strawberry fields are facing a 38% higher childhood cancer rate than average."[55] Further, "[r]esearchers identified 13 pesticides linked to childhood cancer being

[54] Moms Across America, *FAQs*, https://www.momsacrossamerica.com/faq (last visited June 9, 2026).

[55] Moms Across America, Instagram Post dated May 18, 2026, https://www.instagram.com/p/DYe3uBSlfFN/.

CLASS ACTION COMPLAINT

sprayed within 2.5 miles of homes and 98.5% of the leukemia-linked pesticides studied were applied in Watsonville, California, where Driscoll's main strawberry operations are located."[56]



79.     Despites its extensive marketing regarding safety, wholesomeness, and rigorous standards as illustrated above, Driscoll's failed to adequately disclose to consumers the alleged presence and/or use of persistent fluorinated pesticide compounds associated with PFAS chemistry.

80.     Driscoll's knew or should have known that reasonable consumers would consider such information material.

81.     Driscoll's possessed superior knowledge concerning its agricultural practices, supplier standards, pesticide protocols, and residue testing.

82.     No where on the clamshell plastic box that Defendant champions as innovation in packaging and marketing does Driscoll's disclose that its Strawberries contain PFAS or that Driscoll's uses, and allows licensees to use, PFAS-laden pesticides to produce its Strawberries. To the contrary, Defendant only states its trademarked phase "Only the Finest Berries."

---

[56] *Id.*

CLASS ACTION COMPLAINT

**E.** **INTERNATIONAL REGULATORY STANDARDS AND FOREIGN RESIDUE LIMITS FURTHER DEMONSTRATE THE MATERIALITY OF THE ALLEGED PFAS-RELATED RESIDUES**

83. The independent testing and reporting underlying this action identified pesticide residue levels in Defendant's Strawberries that exceeded regulatory limits or standards established in multiple foreign jurisdictions.

84. The existence of stricter standards and lower allowable limits in numerous foreign countries is relevant to materiality, consumer expectations, and Defendant's knowledge concerning the nature of the alleged residues, especially considering Defendant must concede it is a global company, working with 900 berry growers in 20 countries worldwide.

85. Multiple countries and international regulators have adopted more precautionary approaches to PFAS-related compounds, fluorinated pesticides, and persistent chemical residues in strawberries because of concerns regarding environmental persistence, bioaccumulation, and potential long-term human exposure.

86. The fact that alleged residue levels may exceed limits deemed acceptable in other developed nations supports the reasonableness of consumer concerns regarding the presence of such compounds in Strawberries marketed as "safe," "wholesome," and subject to "rigorous food safety standards."

87. Reasonable consumers are increasingly aware that regulatory standards concerning PFAS compounds and persistent fluorinated chemicals continue to evolve worldwide and that certain jurisdictions have developed more protective standards than those currently in place in the United States.

88. The foreign standards and limits are not alleged herein as independent legal duties governing Defendant's conduct in the United States. Rather, they are relevant evidence of:

      a.    The growing scientific and regulatory concern surrounding PFAS-related compounds;

      b.    The materiality of such compounds to reasonable consumers;

      c.    The feasibility of stricter residue limitations and alternative agricultural practices; and

31

      d.     The misleading nature of Defendant's representations and misleading partial disclosures regarding wholesomeness, sustainability, and pesticide practices.

89. The existence of stricter international standards further demonstrates that reasonable consumers could attach significant importance to information concerning PFAS-related pesticide compounds and persistent fluorinated residues when making purchasing decisions.

**F.    DEFENDANT'S GREENWASHING CLAIMS ARE DECEPTIVE AND VIOLATE THE GREEN GUIDES**

90. Driscoll's has repeatedly represented to consumers that it is committed to environmental sustainability, responsible resource management, and agricultural practices designed to protect natural ecosystems. Through its sustainability initiatives, marketing materials, and corporate communications, Driscoll's portrays itself as a company that operates in harmony with the environment and prioritizes long-term ecological health.

91. Driscoll's publicly states that, "Driscoll's defines Sustainability as 'meeting our present needs without compromising the ability of future generations to meet their needs.' [Driscoll's] see[s] economic performance as inseparable from social and environmental performance." [57]

---

[57] Driscoll's, *Sustainability*, https://www.driscolls.com/about/Sustainability (last visited June 9, 2026).

CLASS ACTION COMPLAINT

Thriving in the Present, Providing for the Future

As a multi-generational, family-owned company, Driscoll's defines Sustainability as "meeting our present needs without compromising the ability of future generations to meet their needs." We see economic performance as inseparable from social and environmental performance. This concept is commonly referred to as the Triple Bottom Line. We recognize that the achievement of true sustainability, or a healthy triple bottom line, is a journey and one in which we do not have all the answers, but we have fully committed resources and committed company leadership ensuring that we make continual progress toward waste reduction and better care for the natural and social resources on which we depend.

We believe we have a responsibility—and an opportunity—to be leaders in the agricultural industry. We work closely with our farmers, supply chain partners and the communities in which we operate to address the environmental risks to our business and our local communities. Our collaborative approach allows us to have a greater impact beyond berry production and take advantage of external expertise and capabilities.

92.     In addition, among other things, Driscoll's publicly states that it seeks to create "a future where resources are managed responsibly" and emphasizes that it works "with the land, not against it." Driscoll' further represents that it supports "innovations and sustainable practices" intended to protect the long-term viability of agriculture and natural resources. These representations and misleading partial disclosures communicate to reasonable consumers that Driscoll's berry production practices are environmentally responsible and designed to minimize harmful environmental impacts.

93.     Driscoll's also prominently markets its sustainability efforts through initiatives focused on water conservation, water quality improvement, biodiversity, soil health, and regenerative agricultural practices. The company identifies water conservation and water-quality protection as core sustainability priorities and represents that it works collaboratively with growers and communities to drive sustainability change. Through these statements, Driscoll's conveys that its agricultural operations are conducted in a manner that protects natural resources and promotes environmental stewardship.[58]

---

[58] *Id.*

33
CLASS ACTION COMPLAINT

**Water: Our Most Precious Resource**

After identifying our greatest risks and the opportunities, we established water conservation and improving water quality as our first sustainability priority. Water is a critical resource for residents and industry, particularly for agriculture, yet many places face critical water quality and supply issues. Driscoll's has taken great strides to address these issues and drive sustainable change by working collaboratively with our independent farmers and the community.



**Water Conservation and Quality**

Driscoll's partners with our independent farmers, government agencies and the University of California to address water shortage

Learn More →

94.     Reasonable consumers are increasingly concerned about the environmental consequences of agricultural production, including contamination of soil and water resources through the use of persistent synthetic chemicals. As a result, Driscoll's environmental stewardship and sustainability representations and misleading partial disclosures are material to consumers' purchasing decisions and contribute to the premium reputation and value associated with the Driscoll's brand.

CLASS ACTION COMPLAINT

95.    A survey conducted by NIQ found that 77% of respondents would stop purchasing a brand if it was found guilty of greenwashing.[59]



96.    Importantly, these representations and misleading partial disclosures are in response to more consumers wanting to buy environmentally friendly products and companies touting the environmental benefits of their products.

97.    The Federal Trade Commission ("FTC") released its initial "Guides for the Use of Environmental Marketing Claims" ("Green Guides")[60] that "set forth the [FTC's] current views about environmental claims" and provide guidance to marketers to "avoid making environmental claims that are unfair or deceptive under Section 5 of the FTC Act, 15 U.S.C. § 45."[61]

---

[59] NIQ, *How to Turn Green Consumer Intentions into Sustainable Actions* (Sept. 26, 2023), *available at* https://nielseniq.com/global/en/insights/report/2023/how-to-turn-green-consumer-intentions-into-sustainable-actions/ (last visited June 9, 2026).

[60] 16 C.F.R. § 260 (2026) (Guides for the Use of Environmental Marketing Claims ("Green Guides").

[61] 16 C.F.R. § 260.1 (2026).

98. Numerous states have codified and/or incorporated the Green Guides into their respective laws or regulations, in part or in whole, including California, which has explicitly adopted the Green Guides.[62]

99. The FAL prohibits both explicit and implicit "untruthful, deceptive, or misleading environmental marketing claim[s]."[63] An "environmental marketing claim" includes any claim contained in the FTC's Green Guides. [64]

100. The Green Guides, as well as California law, apply to Defendant's environmental representations.

101. The Green Guides "apply to claims about the environmental attributes of a product, package, or service in connection with the marketing, offering for sale, or sale of such item or service to individuals. These guides also apply to business-to-business transactions. The guides apply to environmental claims in labeling, advertising, promotional materials, and all other forms of marketing in any medium, whether asserted directly or by implication, through words, symbols, logos, depictions, product brand names, or any other means."[65]

102. The Green Guides include "general principles, specific guidance on the use of particular environmental claims, and examples . . . [that] provide the [FTC's] views on how reasonable consumers likely interpret certain claims."[66] The FTC bases such views on consumer perception research it has conducted.[67]

103. "Section 5 of the FTC Act prohibits deceptive acts and practices in or affecting commerce. A representation, omission, or practice is deceptive if it is likely to mislead

[62] Connor J. Fraser, *What's in a Label? The FTC's "Green Guides" in Context*, STATE ENERGY & ENV'T IMPACT CTR., N.Y.U. SCH. LAW 4–5 (Feb. 23, .2023), https://stateimpactcenter.org/files/Whats-in-a-Label-The-FTC-Green-Guides-Issue-Brief.pdf; *see also* Bus. & Prof. Code § 17580.5.

[63] Bus. & Prof. Code § 17580.5(a).

[64] *Id.*

[65] 16 C.F.R. § 260.1(c).

[66] 16 C.F.R. § 260.1(d).

[67] FTC, The Green Guides Statement of Basis and Purpose, at 3, https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-issues-revised-green-guides/greenguidesstatement.pdf.

36

CLASS ACTION COMPLAINT

consumers acting reasonably under the circumstances and is material to consumers' decisions."[68] "Whether a particular claim is deceptive will depend on the net impression of the advertisement, label, or other promotional material at issue."[69]

104.    "To determine if an advertisement is deceptive, marketers must identify all express and implied claims that the advertisement reasonably conveys. Marketers must ensure that all reasonable interpretations of their claims are truthful, not misleading, and supported by a reasonable basis before they make the claims."[70]

105.    "[A] reasonable basis often requires competent and reliable scientific evidence [such as] tests, analyses, research, or studies that have been conducted and evaluated in an objective manner by qualified persons and are generally accepted in the profession to yield accurate and reliable results."[71]

106.    With respect to general environmental benefit claims, the Green Guides state "[i]t is deceptive to misrepresent, directly or by implication, that a product, package, or service offers a general environmental benefit."[72]

107.    However, the Green Guides address a "general environmental claim, [] focus[ing] on the net impression of an advertisement."[73] The FTC states:

    a.   It is deceptive to misrepresent, directly or by implication, that a product, package, or service offers a general environmental benefit.

    b.   Unqualified general environmental benefit claims are difficult to interpret and likely convey a wide range of meanings. In many cases, such claims likely convey that the product, package, or service has specific and far-reaching environmental benefits and may convey that the item or service has no

---

[68] 16 C.F.R. § 260.2.

[69] 16 C.F.R. § 260.1(d) (emphasis added).

[70] 16 C.F.R. § 260.2.

[71] *Id.*

[72] 16 C.F.R. § 260.4(a).

[73] FTC, *supra* n.67, at 54 (internal citations omitted); *see also* 16 C.F.R. § 260.4 (regarding general environmental benefit claims).

CLASS ACTION COMPLAINT

negative environmental impact. Because it is highly unlikely that marketers can substantiate all reasonable interpretations of these claims, marketers should not make unqualified general environmental benefit claims.

c. Marketers can qualify general environmental benefit claims to prevent deception about the nature of the environmental benefit being asserted. To avoid deception, marketers should use clear and prominent qualifying language that limits the claim to a specific benefit or benefits. Marketers should not imply that any specific benefit is significant if it is, in fact, negligible. If a qualified general claim conveys that a product is more environmentally beneficial overall because of the particular touted benefit(s), marketers should analyze trade-offs resulting from the benefit(s) to determine if they can substantiate this claim.

d. Even if a marketer explains, and has substantiation for, the product's specific environmental attributes, this explanation will not adequately qualify a general environmental benefit claim if the advertisement otherwise implies deceptive claims. Therefore, marketers should ensure that the advertisement's context does not imply deceptive environmental claims.[74]

108. The Green Guides provide an example: A marketer's advertisement features a picture of a laser printer in a bird's nest balancing on a tree branch, surrounded by a dense forest. In green type, the marketer states, "Buy our printer. Make a change." Although the advertisement does not expressly claim that the product has environmental benefits, the featured images, in combination with the text, likely convey that the product has far-reaching environmental benefits and may convey that the product has no negative environmental impact. Because it is highly unlikely that the marketer can substantiate these claims, this advertisement is deceptive.[75]

109. Because the net impression of Defendant's environmental marketing claims is likely to mislead reasonable consumers, they are deceptive, especially because "[e]ven if a

---

[74] 16 C.F.R. § 260.4(a)-(d).

[75] 16 C.F.R. § 260.4, Example 3.

marketer explains, and has substantiation for, the product's specific environmental attributes, this explanation will not adequately qualify a general environmental benefit claim if the advertisement otherwise implies deceptive claims."[76]

110.    The environmental marketing claims are also material to the purchasing decisions of reasonable consumers. Because the claims are deceptive and material and because the marketing otherwise implies deceptive claims, they are in violation of Section 5 of the FTC Act as well as California state laws.[77]

111.    Here, Driscoll's makes environmental marketing claims regarding the environmental features of the Strawberries and the methods to grow the Strawberries, but the marketing otherwise implies deceptive claims due to the undisclosed presence or risk of PFAS.

112.    Defendant knew or reasonably should have known that its misrepresentations, misleading partial disclosures, and omissions were untrue and misleading.

113.    Defendant does not ensure that all reasonable interpretations of its claims are truthful, not misleading or deceptive to reasonable consumers.

114.    "Greenwashing is the act of making false or misleading statements about the environmental benefits of a product or practice."[78] Companies like Defendant rely on greenwashing because "going green sells[,]" with "85 percent of global consumers [saying] they considered the environment more when shopping than they did just five years prior[.]"[79]

115.    Defendant's reliance on and use of greenwashing deceived and misled reasonable consumers into believing it was committed to benefiting the environment.

116.    Defendant's statements and claims neither conform to the guidance nor are consistent with the examples provided in the Green Guides.

---

[76] 16 C.F.R. § 260.4(d).

[77] *See*, *e.g.*, Bus. & Prof. Code § 17580.5(a) (2026) ("It is unlawful for a person to make an untruthful, deceptive, or misleading environmental marketing claim, whether explicit or implied. For the purpose of this section, 'environmental marketing claim' shall include any claim contained in the 'Guides for the Use of Environmental Marketing Claims' published by the Federal Trade Commission.").

[78] Courtney Lindwall, *What is Greenwashing*?, NAT'L RES. DEF. COUNCIL (Feb. 9, 2023), https://www.nrdc.org/stories/what-greenwashing.

[79] *Id*.

117.    The Green Guides apply to Defendant's representations and misleading partial disclosures to consumers as a business committed to sustainability and to reducing the environmental impact of its business practices and products.

118.    Defendant relies on misleading and deceptive greenwashing to market and sell the Strawberries to consumers, including those who are environmentally conscious.

119.    Defendant has even marketed itself impressing Mother Nature with its progress towards meeting environmental goals and making promises for continued progress to Mother Nature.

120.    Defendant knows its environmental efforts are important to its customers.

**G.    DRISCOLL'S EXERCISES EXTENSIVE CONTROL OVER STRAWBERRIES SOLD UNDER ITS BRAND AND CANNOT AVOID LIABILITY THROUGH ITS USE OF "INDEPENDENT" GROWERS**

121.    Driscoll's cannot avoid liability by characterizing the farms, growers, harvesters, or agricultural operations involved in producing its Strawberries as "independent" entities.

122.    Driscoll's senior vice-president and general counsel compared the company to its neighbor in Silicon Valley, explaining that "Growers are sort of like our manufacturing plants, [] we made the inventions, they assemble it, and then we market it, so it's not that dissimilar from Apple using someone else to do the manufacturing but they've made the invention and marketed the end product." [80]

123.    Driscoll's markets the Strawberries under the Driscoll's brand name and holds itself out to consumers as responsible for the quality, safety, consistency, and standards associated with its Strawberries.

124.    Driscoll's exercises substantial control over the cultivation, sourcing, quality assurance, packaging, marketing, and distribution of Strawberries sold under the Driscoll's brand.

---

[80] Dana Goodyear, *How Driscoll's Reinvented the Strawberry*, NEW YORKER, Aug. 14, 2017, *available at* https://www.newyorker.com/magazine/2017/08/21/how-driscolls-reinvented-the-strawberry.

CLASS ACTION COMPLAINT

125.    Driscoll's publicly represents that it works closely with growers and implements company-wide standards governing food safety, agricultural practices, pest management and sustainability initiatives.

126.    Driscoll's further represents that it conducts extensive audits, monitoring, and oversight of growing practices associated with berries sold under its brand, including oversight relating to pest control methods and pesticide practices.

127.    Driscoll's also develops proprietary berry varieties, establishes growing specifications, and controls the standards that growers must satisfy in order to sell Strawberries under the Driscoll's name.

128.    Consumers purchase Strawberries bearing the Driscoll's label because they rely upon the reputation, marketing, quality assurance, and representations made by Driscoll's itself, not because consumers know or rely upon any individual grower, farm laborer, picker, or independent farming operation.

129.    Driscoll's liability arises from its own representations, misleading partial disclosures, omissions, branding, marketing, quality assurances, and control over Strawberries sold under the Driscoll's brand.

130.    Driscoll's possessed superior knowledge regarding the agricultural practices, pesticide protocols, supplier standards, residue testing, and sourcing practices associated Strawberries sold under its brand.

131.    Driscoll's was in a position to require disclosures, modify supplier requirements, implement different pesticide standards, conduct additional testing, or alter its marketing and labeling practices.

132.    Driscoll's profited directly from the sale of Strawberries marketed under the Driscoll's brand and derived substantial economic benefit from consumer reliance on its representations and misleading partial disclosures concerning safety, wholesomeness, sustainability, and food quality.

133.    Accordingly, Driscoll's is responsible for the misleading and deceptive representations, misleading partial disclosures, and omissions alleged herein regardless of

41

whether certain farming, harvesting, or growing activities were performed by nominally independent growers or suppliers.

### H.   DUE TO THE PRESENCE AND MATERIAL RISK OF PFAS IN THE STRAWBERRIES, DRISCOLL'S MARKETING WAS MATERIALLY MISLEADING

134.   At all times relevant to the allegations pled in this complaint, Defendant knew or should have known that the Strawberries contained undisclosed PFAS and/or PFAS-related compounds.

135.   Defendant knew or should have known that PFAS pose risks to human health and the environment.

136.   Defendant knew or should have known that it owed consumers a duty of care to adequately monitor and test the Strawberries for PFAS and/or PFAS-related compounds, and to prevent or, at the very least, minimize the presence of PFAS and/or PFAS-related compounds in the Strawberries to an undetectable level.

137.   A company like Driscoll's that markets its products with both personal health benefits and environmental features must not knowingly fail to ensure the safety of its products or allow unsuspecting consumers to unwittingly be exposed to dangerous toxins or contaminants, such as PFAS.

138.   Rather, Driscoll's has a duty to disclose material information such as the presence or risk of PFAS in the Strawberries, which would allow consumers to make informed decisions for themselves and their families about the risks they are willing to take and assess the true value of the Strawberries they are considering purchasing. Driscoll's failed to disclose that information to Plaintiff and the Class.

139.   Despite the known risks of exposure to PFAS, Defendant intentionally, negligently, recklessly, and/or knowingly sold the Strawberries without disclosing to consumers, like Plaintiff and the Class, the presence or material risk of PFAS in the Strawberries.

140.   Defendant knew consumers purchased the Strawberries based on the reasonable expectation that it grew and manufactured the Strawberries to the highest personal health and environmental standards. Based on consumers' expectation that Defendant grew and

manufactured the Strawberries to the highest standards, Defendant knew or should have known consumers reasonably inferred that Defendant would hold the Strawberries to the highest standards for preventing the inclusion of PFAS in the Strawberries, which would include adequately monitoring and testing the Strawberries for PFAS.

141. Defendant knew that testing and monitoring for PFAS in the Strawberries and responsibly growing and manufacturing the Strawberries to prevent or minimize the presence of chemicals such as PFAS was not only important, but critical to its consumers to protect their health and the environment.

142. Further, Defendant knew or should have known it could control the levels of PFAS in the Strawberries by properly growing the Strawberries without utilizing PFAS-related pesticides.

143. Based on the foregoing, reasonable consumers, like Plaintiff, would consider the presence (or material risk) of PFAS a material fact when considering purchasing Strawberries.

144. Based on the overall impression given by Defendant's representations, misleading partial disclosures, and omissions, no reasonable consumer could expect or understand that the Strawberries contained (or had a material risk of containing) PFAS.

145. The misrepresentations, misleading partial disclosures, and omissions wrongfully convey to consumers that the Strawberries have certain quality and characteristics that they do not actually possess, including that the Strawberries do not contain PFAS.

146. Based on the misleading partial disclosures and omissions, a reasonable consumer would not expect the presence of PFAS, nor would a reasonable consumer be able to detect the presence of PFAS in the Strawberries without conducting his or her own scientific tests (which are time-consuming and expensive) or reviewing third-party scientific testing.

147. Reasonable consumers must and do rely on Defendant to honestly report what the Strawberries contain.

148. Defendant intended Plaintiff to, and Plaintiff did, rely on the Strawberries' marketing, packaging, and omissions when making her purchasing decision.

CLASS ACTION COMPLAINT

149.    Plaintiff's expectations of the Strawberries and reliance on Defendant's marketing and packaging are consistent with reasonable consumers.

150.    Defendant acted knowingly, negligently, recklessly, and/or intentionally with its deceptive, unfair, and misleading marketing and packaging based on the material misrepresentations, misleading partial disclosures, and omissions.

151.    Additionally, Defendant knew that reasonable consumers would be ingesting and eating the Strawberries, increasing the consumer's risk to PFAS.

152.    The misrepresentations, misleading partial disclosures, and omissions are material and likely to deceive reasonable consumers, such as Plaintiff, in their purchasing decisions. This is true especially considering the long-standing campaign by Defendant to market the Strawberries with personal health benefits and environmental features, and to induce consumers, such as Plaintiff, to purchase the Strawberries.

153.    The misrepresentations, misleading partial disclosures, and omissions make the Strawberries' marketing deceptive, misleading, and unfair, due to Defendant's failure to disclose the true nature and quality of the Strawberries based on the presence or material risk of PFAS.

154.    Defendant knew or should have known the Strawberries were not consistent with its marketing and packaging because of the presence or risk of PFAS.

155.    Defendant knew or should have known consumers paid premium prices for the Strawberries because of its misrepresentations, misleading partial disclosures, and omissions.

156.    The misrepresentations, misleading partial disclosures, and omissions were intended to and did, in fact, cause consumers like Plaintiff and the Class members to purchase the Strawberries they would not have if the true quality and nature of the Strawberries were disclosed or for which they would not have paid a premium price.

I.    **PLAINTIFF'S RELIANCE WAS REASONABLE AND FORESEEN BY DEFENDANT AND ASSOCIATED ECONOMIC INJURY**

157.    The representations, misleading partial disclosures, and omissions allowed Defendant to capitalize on, and reap enormous profits from, reasonable consumers who paid a premium price for the Strawberries that did not disclose material information as to the

44

CLASS ACTION COMPLAINT

Strawberries' true nature, quality, and value. Defendant continues to wrongfully induce consumers to purchase the Strawberries without disclosing the presence or risk of PFAS in the Strawberries.

158.    Plaintiff read and relied upon the marketing and packaging of the Strawberries when making her purchasing decisions. Had she known Defendant misrepresented and failed to disclose the Strawberries contained (or had a material risk of containing) PFAS, she would not have purchased the Strawberries or paid a premium price.

159.    A reasonable consumer would consider the marketing and packaging of a product when deciding whether to purchase. Moreover, as demonstrated by the consumer surveys set forth herein, a reasonable consumer would view as material representations that a product is "safe," 'wholesome," and produced under "rigorous food safety standards" not to contain persistent fluorinated pesticide compounds and PFAS-related residues that consumer increasingly seek to avoid.

160.    Moreover, Defendant had sufficient notice of its breach of implied warranties. Defendant has, and had, exclusive or superior knowledge of the manufacturing processes, quality control policies, the pesticides and synthetic materials used in the growing process, and whether the Strawberries contained PFAS.

161.    Privity exists with Plaintiff and the proposed Class because Defendant knew that reasonable consumers such as Plaintiff and the proposed Class would be the end purchasers of the Strawberries and the targets of its marketing and packaging.

162.    Defendant intended that the marketing, packaging, and implied warranties would be considered by the end purchasers of the Strawberries, including Plaintiff and the proposed Class.

163.    Defendant directly targeted Plaintiff and the proposed Class through its marketing and packaging.

164.    Plaintiff and the proposed Class are the intended beneficiaries of the implied warranties.

45

## V. APPLICABILITY OF EQUITABLE TOLLING AND THE DISCOVERY RULE TO THE STATUTE OF LIMITATIONS

165. The statute of limitations is tolled for all of Plaintiff's statutory consumer protection and common law claims due to Defendant's fraudulent concealment that the Strawberries contained (or had a material risk of containing) PFAS. Defendant intentionally concealed these material facts from Plaintiff.

166. Defendant knew the misrepresentations, misleading partial disclosures, and omissions were a material consideration for any consumer buying the Strawberries.

167. Defendant violated the relevant state consumer fraud acts by deceiving customers as to the true quality, characteristics, and nature of the Strawberries.

168. Based on Defendant misrepresenting and concealing material facts from Plaintiff, Plaintiff could not reasonably discover that the Strawberries contained (or had a material risk of containing) PFAS.

169. Plaintiff was unaware that the Strawberries contained, or were produced using pesticides associated with, PFAS-related compounds. Instead, Defendant affirmatively promoted the Strawberries as being subject to rigorous food safety, quality assurance, and sustainability practices, while omitting material information concerning the presence and/or use of persistent fluorinated compounds associated with so-called "forever chemicals."

170. Plaintiff's and Class members' causes of action accrued no earlier than May 12, 2026, the date of the Mamavation Report. This is the earliest date by which Plaintiff and other Class members could have reasonably been on notice about the actual or potential presence of PFAS in Defendant's Strawberries.

171. Plaintiff and other Class members exercised reasonable diligence but could not discover PFAS or Defendant's wrongful conduct, because, as demonstrated supra, Defendant's wrongful acts were concealed from Plaintiff and the public, and facts pertinent to same were within Defendant's possession and control.

172. Alternatively, any statute of limitation or prescriptive period is equitably tolled because of fraudulent concealment. Defendant affirmatively concealed from Plaintiff and other Class members its unlawful conduct. Defendant affirmatively strove to avoid disclosing its

knowledge of its wrongful conduct, and of the fact that PFAS was used and present in the Strawberries.

173. Defendant continued to publicly represent and warrant that the Strawberries were high quality, merchantable, and did not contain any dangerous undisclosed substances.

174. Because of this, Plaintiff and other Class members did not discover, nor could they have discovered through reasonable and ordinary diligence, Defendant's deceptive and unlawful conduct alleged herein. Defendant's misleading partial disclosures lulled Plaintiff and Class members into believing that the prices paid for Defendant's Strawberries were appropriate despite their exercise of reasonable and ordinary diligence.

175. As a result of Defendant's affirmative and other acts of concealment, any applicable statutes of limitations affecting the rights of Plaintiff and other Class members has been tolled.

176. Plaintiff and other Class members exercised reasonable diligence by, among other things, upon learning of the true facts, promptly investigating and bringing the allegations contained herein.

177. Despite these or other efforts, Plaintiff was unable to discover, and could not have discovered, the unlawful conduct alleged herein at the time it occurred or at an earlier time so as to enable any complaint to be filed sooner.

## VI. CLASS ALLEGATIONS

178. Plaintiff brings this action both individually and on behalf of the following class:

> All persons residing in California who, during the applicable limitations period through the earlier of (i) the date on which Defendant ceases the deceptive representations, omissions, or misleading partial disclosures alleged herein, or (ii) the date of class certification, purchased Driscoll's Strawberries for personal, family, or household use, and not for resale (the "Class").

179. Excluded from the Class are: (a) any judge or magistrate presiding over this action, and members of their families; (b) Defendant and its employees, officers, directors, and agents; (c) Defendant's legal representatives, assigns, and successors; and (d) all persons who properly execute and file a timely request for exclusion from any Court-approved class.

180. Plaintiff reserves the right to narrow or expand the foregoing class definitions, or to create or modify subclasses as the Court deems necessary.

181. Driscoll's challenged conduct occurred in California and Plaintiff's claims arise from uniform marketing, branding, labeling, packaging, advertising, and omission practices disseminated to consumers throughout California and the United States.

182. Driscoll's marketed and sold its Strawberries in California using substantially uniform representations emphasizing safety, wholesomeness, sustainability, rigorous food safety standards, integrated pest management practices, and reductions in synthetic pesticide use.

183. The alleged omissions and deceptive practices likewise emanated from centralized and uniform corporate conduct, policies, and marketing decisions controlled by Defendant.

184. Consumers in California purchased Defendant's Strawberries in reliance on the same or substantially similar representations, misleading partial disclosures, and omissions and suffered similar economic injuries in the form of price premiums paid for Strawberries allegedly worth less than represented.

185. This action is brought and may be properly maintained as a class action. There is a well-defined community of interests in this litigation and the members of the Class are easily ascertainable.

186. **Numerosity:** While the exact number of Class members cannot be determined without discovery, they are believed to consist of potentially millions of consumers nationwide. The Class is therefore so numerous that joinder of all members is impracticable.

187. **Commonality:** Common questions of law and fact exist as to all Class Members, including, but not limited to:

    a. Whether Defendant made warranties to Plaintiff and other Class Members regarding its Strawberries;

    b. Whether Defendant's Strawberries contained undisclosed PFAS;

CLASS ACTION COMPLAINT

c. Whether Defendant falsely represented that its Strawberries were merchantable, fit for intended purposes, and otherwise of the quality and composition represented;

d. Whether Defendant owed a duty to disclose;

e. Whether Defendant's partial disclosures that its Strawberries were "safe," "wholesome" and "sustainably sourced" were misleading;

f. Whether Defendant knew or should have known that the Strawberries contained or had a risk of containing PFAS;

g. Whether Defendant omitted facts regarding its manufacture, sale, or testing of its Strawberries;

h. Whether Defendant's omissions were material to Plaintiff, the Class, or a reasonable consumer;

i. Whether Defendant's packaging is false, deceptive, misleading, or likely to deceive;

j. Whether Plaintiff and other Class members have been economically damaged as a result of Defendant's unlawful conduct, and the amount of their damages'

k. The scope of injunctive relief.

l. Whether Defendant fraudulently concealed Plaintiff's and other Class members' causes of action.

188. **Typicality:** Plaintiff's claims are typical of other Class members' claims. Plaintiff and other Class members all suffered the same type of economic harm. Plaintiff has substantially the same interest in this matter as all other Class members, and their claims arise out of the same set of facts and conduct as the claims of all other Class members.

189. **Adequacy of Representation:** Plaintiff is committed to pursuing this action and has retained competent counsel experienced in complex consumer fraud litigation, class actions, and UCL and FAL actions. Accordingly, Plaintiff and Plaintiff's counsel will fairly and adequately protect the interests of other Class members. Plaintiff's claims are coincident with,

and not antagonistic to, those of the other Class members she seeks to represent. Plaintiff has no disabling conflict with other Class members and will fairly and adequately represent the interests of Class members.

190. Defendant has acted on grounds that apply generally to all Class members so that preliminary and/or final injunctive relief and corresponding declaratory relief are appropriate respecting the Class as a whole given the cohesiveness of same.

191. The common questions of law and fact enumerated above predominate over the questions affecting only individual Class members, and a class action is the superior method for fair and efficient adjudication of the controversy. Although many other Class members have claims against Defendant, the likelihood that individual Class members will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. Serial adjudication in numerous venues would not be efficient, timely, or proper. Judicial resources would be unnecessarily depleted by resolution of individual claims. Joinder on an individual basis of thousands of claimants in one suit would be impractical or impossible. In addition, individualized rulings and judgments could result in inconsistent relief for similarly situated plaintiffs. Plaintiff's counsel, experienced in complex consumer litigation, class actions, and UCL and FAL litigation, foresee little difficulty in the management of this case as a class action.

## VII.    CLAIMS FOR RELIEF

### COUNT ONE

**Violation of the Unfair Competition Law**
**Bus. & Prof. Code § 17200 *et seq.***
**(on Behalf of Plaintiff and the Class)**

192. Plaintiff adopts, realleges, and incorporates by reference paragraphs 1 through 191 of this Complaint as if fully set forth herein and further alleges as follows.

193. The Unfair Competition Law ("UCL"), as defined in Business and Professions Code section 17200 *et seq.*, prohibits "any unlawful, unfair or fraudulent business act or practice."

50

CLASS ACTION COMPLAINT

194. Defendant, Plaintiff, and members of the Class are each a "person" under the UCL, which includes "natural persons, corporations, firms, partnerships, joint stock companies, associations and other organizations of persons." Bus. & Prof. Code § 17201.

195. In its advertising and sale of the strawberries, Defendant's conduct violated the UCL through its: (1) unlawful; (2) unfair; and/or (3) fraudulent business acts or practices:

## A. UNLAWFUL

196. As alleged herein, Defendant's failure to disclose the presence or risk of PFAS and/or PFAS-related compounds in its Strawberries violates at least the following laws:

    a. the CLRA, Business and Professions Code section 17500 *et seq.*; and

    b. the FAL, Business and Professions Code sections 17500 *et seq.* and section 17580 *et seq.*

## B. UNFAIR

197. Under the UCL, a business act or practice is "unfair" if the defendant's conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the benefits for committing such acts or practices are outweighed by the gravity of the harm to the alleged victims.

198. Defendant's conduct with respect to the marketing, packaging, and sale of the Strawberries is unfair because Defendant's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers and the utility of its conduct, if any, does not outweigh the gravity of the harm to its victims.

199. Defendant's conduct with respect to the marketing, packaging, and sale of the Strawberries is also unfair because it violates public policy as declared by specific constitutional, statutory, or regulatory provisions, including but not limited to the FAL, including with respect to environmental representations, and the CLRA.

51

CLASS ACTION COMPLAINT

## C.    FRAUDULENT

200.    Under the UCL, a business act or practice is "fraudulent" if it actually deceives or is likely to deceive members of the consuming public.

201.    Defendant's business acts or practices were fraudulent in that Defendant deceptively and misleadingly omitted that the Strawberries contained (or had a material risk of containing) PFAS and/or PFAS-related compounds, which deceived or was likely to deceive members of the consuming public, including Plaintiff and members of the Class.

202.    Defendant knew or should have known the Strawberries contained (or had a material risk of containing) undisclosed PFAS given its control over the manufacturing process for the Strawberries, including the packaging of the Strawberries.

203.    Plaintiff and members of the Class relied on Defendant's omissions, active concealment, and other deceptive conduct regarding the presence or material risk of PFAS in the Strawberries when deciding to purchase the Strawberries, unaware of the undisclosed material facts.

204.    Defendant intended that Plaintiff and members of the Class would rely on its Omissions, active concealment, and other deceptive conduct regarding the presence or material risk of PFAS in the Strawberries when deciding to purchase the Strawberries, unaware of the undisclosed material facts.

205.    The facts concealed or not disclosed by Defendant were material facts in that Plaintiff and members of the Class, and other reasonable consumers would have considered them important in deciding whether to purchase the Strawberries. Had Plaintiff and members of the Class known the Strawberries contained (or had a material risk of containing) PFAS, they would not have purchased the Strawberries or paid the price that they paid.

206.    Defendant's omissions, active concealment, and other deceptive conduct as described herein repeatedly occurred in the course of Defendant's business, trade or commerce and were capable of deceiving a substantial portion of the consuming public.

207.    Defendant's omissions, active concealment, and other deceptive conduct as described herein were consumer-oriented.

208.    Defendant's omissions, active concealment, and other deceptive conduct as described herein were likely to mislead a reasonable person purchasing the Strawberries.

209.    Defendant's omissions, active concealment, and other deceptive conduct caused Plaintiff and members of the Class to suffer injury in the form of actual damages when they purchased the Strawberries that were worth less than the price they paid and that they would not have purchased had they known the Strawberries contained (or had a material risk of containing) PFAS.

210.    As a direct and proximate result of Defendant's violation of the UCL as set forth above, Plaintiff and members of the Class have been harmed. That harm will continue unless Defendant is enjoined from further omitting the true quality of the Strawberries.

211.    Pursuant to Business and Professions Code section 17203, as a direct result of the aforementioned actions by Defendant, Plaintiff and members of the Class seek an order for the restitution of all monies that were unjustly acquired by Defendant through unlawful, unfair and/or fraudulent business acts or practices to the fullest extent available under the law. Plaintiff and members of the Class also seek reasonable attorneys' fees and costs under Code of Civil Procedure section 1021.5.

212.    Pursuant to Business and Professions Code section 17203, as a direct result of the aforementioned actions by Defendant, Plaintiff and members of the Class also seek an order enjoining Defendant from continuing to conduct business through unlawful, unfair and/or fraudulent business acts or practices that violate the UCL.

## COUNT TWO

**Violation of the False Advertising Law**
**Bus. & Prof. Code § 17500 *et seq.***
**(on Behalf of Plaintiff and the Class)**

213.    Plaintiff incorporates by reference and realleges each and every allegation contained in Paragraphs 1–191, as though fully set forth herein.

214.    The FAL, as defined in Business and Professions Code section 17500 *et seq.*, prohibits "any person, firm, corporation or association" from making or disseminating, or causing to be made or disseminated, any statement in connection with the sale of goods "which

is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . . ." Bus. & Prof. Code § 17500.

215.    Defendant, Plaintiff, and the members of the Class are each a "person" under the FAL. Bus. & Prof. Code § 17506.

216.    Defendant made and/or disseminated statements through its advertising of the Strawberries which were untrue or misleading.

217.    Defendant's omissions were untrue or misleading because Defendant deceptively omitted that the Strawberries contained (or had a material risk of containing) PFAS and/or PFAS-related compounds.

218.    Defendant knew or should have known, given its control over the manufacturing process for the Strawberries, including the packaging of the Strawberries, through the exercise of reasonable care that its advertising was untrue or misleading because the Strawberries contained (or had a material risk of containing) undisclosed PFAS.

219.    Plaintiff and members of the Class relied on Defendant's Omissions, active concealment, and other deceptive conduct regarding the presence or material risk of PFAS in the Strawberries when deciding to purchase the Strawberries, unaware of the undisclosed material facts.

220.    Defendant intended that Plaintiff members of the Class would rely on its omissions, active concealment, and other deceptive conduct regarding the presence or material risk of PFAS in the Strawberries when deciding to purchase the Strawberries, unaware of the undisclosed material facts.

221.    The facts concealed or not disclosed by Defendant were material facts in that Plaintiff, members of the Class, and other reasonable consumers would have considered them important in deciding whether to purchase the Strawberries. Had Plaintiff and members of the Class known the Strawberries contained (or had a material risk of containing) PFAS, they would not have purchased the Strawberries or paid the price that they paid.

CLASS ACTION COMPLAINT

222. Defendant's omissions, active concealment, and other deceptive conduct as described herein repeatedly occurred in the course of Defendant's business, trade or commerce and were capable of deceiving a substantial portion of the consuming public.

223. Defendant's omissions, active concealment, and other deceptive conduct as described herein were consumer-oriented.

224. Defendant's omissions, active concealment, and other deceptive conduct as described herein were likely to mislead a reasonable person purchasing the Strawberries.

225. Defendant's omissions, active concealment, and other deceptive conduct caused Plaintiff and members of the Class to suffer injury in the form of actual damages when they purchased the Strawberries that were worth less than the price they paid and that they would not have purchased had they known the Strawberries contained (or had a material risk of containing) PFAS and/or PFAS-related compounds.

226. As a direct and proximate result of Defendant's violation of the FAL as set forth above, Plaintiff and members of the Class have been harmed. That harm will continue unless Defendant is enjoined from further omitting the true quality of the Strawberries.

227. Pursuant to Bus. & Prof. Code § 17535, as a direct result of the aforementioned actions by Defendant, Plaintiff and members of the Class seek an order for the restitution of all monies that were unjustly acquired by Defendant through its untrue or misleading business acts or practices to the fullest extent available under the law. Plaintiff and members of the Class also seek reasonable attorneys' fees and costs under Code of Civil Procedure section 1021.5.

228. Pursuant to Business and Professions Code section 17535, as a direct result of the aforementioned actions by Defendant, Plaintiff and members of the Class also seek an order enjoining Defendant from continuing to conduct business through untrue and/or misleading business acts or practices that violate the FAL.

## COUNT THREE

### Violation of the Environmental Marketing Claims Act
### Bus. & Prof. Code § 17580 *et seq.*
### (on Behalf of Plaintiff and the Class)

229.   Plaintiff incorporates by reference and reallege each and every allegation contained in Paragraphs 1–191, as though fully set forth herein.

230.   The FAL, and specifically, the Environmental Marketing Claims Act ("EMCA") prohibits a person from making "an untruthful, deceptive, or misleading environmental marketing claim, whether explicit or implied." Bus. & Prof. Code § 17580.5(a).

231.   "Environmental marketing claim" includes any claim contained in the FTC's Green Guides. Bus. & Prof. Code § 17580.5(a).

232.   As set forth herein, Defendant's untruthful, deceptive, and misleading environmental marketing claims are likely to deceive the public. Defendant's claims related to the general environmental features in manufacturing and growing the Strawberries are likely to deceive the public. Defendant's claims related to the general environmental features in manufacturing and growing the Strawberries violate the FTC's Green Guides, and, thus, the FAL and EMCA.

233.   Defendant's claims of manufacturing the Strawberries includes features that are untruthful, deceptive, and misleading because of the undisclosed presence or risk of PFAS and PFAS-related compounds in the Strawberries.

234.   Defendant knew, or reasonably should have known, that its claims of manufacturing the Strawberries included environmental benefits were misleading.

235.   Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary, especially given Plaintiff's desire to purchase the Strawberries in the future if she can be assured that the Strawberries are as marketed and do not contain PFAS.

236.   Plaintiff and members of the Class are entitled to relief as afforded under the law.

CLASS ACTION COMPLAINT

## COUNT FOUR

### Violation of the Consumer Legal Remedies Act
### Civil Code § 1750 *et seq.*
### (on Behalf of Plaintiff and the Class)

237.   Plaintiff incorporates by reference and reallege each and every allegation contained in Paragraphs 1–191, as though fully set forth herein.

238.   The CLRA prohibits certain "unfair methods of competition and unfair or deceptive acts or practices . . . undertaken by any person in a transaction intended to result or that results in the sale or lease of good or services to any consumer." Civ. Code § 1770.

239.   Plaintiff and the members of the Class are each a "consumer" within the meaning of Civil Code sections 1761(d) and 1770, and each has engaged in a "transaction" within the meaning of Civil Code sections 1761(e) and 1770.

240.   Defendant is a "person" within the meaning of Civil Code sections 1761(c) and 1770, and provided "goods" within the meaning of Civil Code sections 1761(a) and 1770.

241.   Plaintiff and each proposed Class member's purchase of the Strawberries constituted a "transaction" as that term is defined in California Civil Code section 1761(e).

242.   Defendant's conduct alleged herein violates the following provisions of CLRA:

a.   Civil Code section 1770(a)(5), by failing to make any mention of PFAS and/or PFAS-related compounds in the Strawberries;

b.   Civil Code section 1770(a)(7), by knowingly, negligently, recklessly, and/or intentionally representing that the Strawberries were of a particular standard, quality, or grade, when they were of another;

c.   Civil Code section 1770(a)(9), by knowingly, negligently, recklessly and/or intentionally marketing and packaging the Strawberries with intent not to sell them as advertised; and

d.   Civil Code section 1770(a)(16), by representing that the Strawberries have been supplied in accordance with previous representations when they have not.

57

CLASS ACTION COMPLAINT

243. Defendant failed to disclose the presence or risk of PFAS and/or PFAS-related compounds in the Strawberries and instead relied on misleading and deceptive omissions and claims of the personal health benefits and environmental features of the Strawberries.

244. Defendant's misrepresentations, misleading partial disclosures, and omissions were material as reasonable consumers such as Plaintiff and the Class would deem the presence of PFAS and/or PFAS-related compounds in the Strawberries important in determining whether to purchase the Strawberries.

245. As there is no safe level of PFAS, the wide range of adverse health effects associated with PFAS exposure, and consumers' prolonged use of the Strawberries (and thus extended exposure to PFAS), Defendant knew or should have known of the safety risks associated with use of the Strawberries due to the presence of PFAS.

246. Defendant knowingly and actively concealed the omissions from Plaintiff and the Class.

247. Defendant was obligated to disclose the presence of PFAS and/or PFAS-related compounds in the Strawberries because:

    a. Defendant had superior knowledge of the presence of PFAS in the Strawberries that were not known or reasonably accessible to Plaintiff and the Class;

    b. Defendant actively concealed the presence of PFAS in the Strawberries from Plaintiff and the Class; and

    c. Defendant made partial statements in the Strawberries' marketing and packaging that gave a misleading impression to reasonable consumers without further information because the presence of PFAS had not been disclosed.

248. Plaintiff and the Class relied upon the information supplied to them by the Defendant's marketing and packaging as to the true quality, characteristics, and nature of the Strawberries.

CLASS ACTION COMPLAINT

249.    As a direct and proximate result of these violations, Plaintiff and the Class have been harmed, and that harm will continue unless Defendant is enjoined from using the misleading marketing and packaging as described herein in any manner in connection with the marketing and packaging and sale of the Strawberries.

250.    Plaintiff sent notice of the violations herein to Defendant pursuant to the CLRA on June 9, 2026.

251.    Plaintiff and members of the Class have suffered harm and seek damages and injunctive relief under the CLRA.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff, on behalf of herself and all others similarly situated, pray for judgment against Driscoll's as to each and every count, including:

A.    An order declaring this action to be a proper class action, appointing Plaintiff and her counsel to represent the Class, and requiring Defendant to bear the costs of class notice;

B.    An order enjoining Defendant from selling the Strawberries until the PFAS and/or PFAS-related compounds are removed or full disclosure of the presence of such appears in all marketing and packaging;

C.    An order enjoining Defendant from selling the Strawberries until the misleading partial disclosures and omissions are disclosed;

D.    An order enjoining Defendant from selling the Strawberries in any manner suggesting or implying that they are beneficial to the health of consumers and the environment;

E.    An order requiring Defendant to engage in a corrective marketing campaign and engage in any further necessary affirmative injunctive relief;

F.    An order awarding declaratory relief, and any further injunctive relief permitted by law or equity, including enjoining Defendant from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendant's conduct;

G.    An order requiring Defendant to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent

business act or practice, untrue or misleading marketing and packaging, or a violation of the state laws, plus pre- and post-judgment interest thereon;

H.      An order requiring Defendant to disgorge or return all monies, revenues, and profits obtained by means of any wrongful or unlawful act or practice;

J.      An order requiring Defendant to pay punitive damages on any count so allowable;

K.      An order awarding attorneys' fees and costs to Plaintiff and the Class; and

L.      An order providing for all other such equitable relief as may be just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: June 9, 2026                          Respectfully Submitted,

**GRANT & EISENHOFER P.A.**

*By: /s/ Jennifer Sarnelli*
Jennifer Sarnelli (#242510)
Thomas Walsh*
485 Lexington Ave., 29th Floor
New York, NY 10017
Telephone: (646) 722-8504
Facsimile: (646) 722-8501
Email:  jsarnelli@gelaw.com
           twalsh@gelaw.com

-and-

Kelly L. Tucker*
Chad B. Holtzman*
123 Justison Street, 7th Floor
Wilmington, DE 19801
Telephone: (302) 622-7109
Facsimile: (302) 622-7100
Email:  ktucker@gelaw.com
           choltzman@gelaw.com

**SEEGER WEISS LLP**

Stephen A. Weiss*
Scott Alan George*
Justin M. Smigelsky*
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Telephone: (973) 639-9100
Facsimile: 973-584-9393
Email:    sweiss@seegerweiss.com
              jsmigelsky@seegerweiss.com

60

CLASS ACTION COMPLAINT

**HECHT PARTNERS LLP**

Rebecca A. Peterson (#241858)
Krista K. Freier*
1650 W. 82nd Street, Ste. 880
Bloomington, MN 55431
Telephone: (612) 778-9595
Facsimile: (888) 421-4173
Email:  rpeterson@hechtpartners.com
          kfreier@hechtpartners.com

-and-

Janine L. Pollack*
Lori G. Feldman*
125 Park Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 851-6821
Facsimile: (888) 421-4173
Email:  jpollack@hechtpartners.com
          lfeldman@hechtpartners.com

*pro hac vice application forthcoming

CLASS ACTION COMPLAINT